NOT DESIGNATED FOR PUBLICATION

No. 116,795

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SWKI-SEWARD WEST CENTRAL, INC.
and
SWKI-STEVENS SOUTHEAST, INC.,
*Appellants*,

v.

KANSAS CORPORATION COMMISSION,
*Appellee*,

and

ANADARKO NATURAL GAS COMPANY LLC,
*Intervenor/Appellee*.


MEMORANDUM OPINION


Appeal from Shawnee District Court; LARRY D. HENDRICKS, judge. Opinion filed January 12, 2018. Reversed and remanded with directions.


*Timothy J. Sear*, of Polsinelli PC, of Overland Park, and *Frank A. Caro, Jr.*, *Anne E. Callenbach*, and *Andrew O. Schulte*, of the same firm, of Kansas City, Missouri, for appellants.


*Brian G. Fedotin*, deputy general counsel and chief appellate counsel, for appellee Kansas Corporation Commission.


*James P. Zakoura* and *Joseph L. McEvoy*, of Smithyman & Zakoura, Chartered, of Overland Park, for intervenor/appellee Anadarko Natural Gas Company LLC.


Before POWELL, P.J., MALONE, J., and LORI A. BOLTON FLEMING, District Judge, assigned.

POWELL, J.: SWKI-Seward West Central, Inc. (SWKI-SWC) and SWKI-Stevens Southeast, Inc. (SWKI-SE) (collectively the SWKIs) appeal from an order of the Kansas Corporation Commission (Commission) dismissing their administrative complaint filed against Anadarko Natural Gas Company LLC (Anadarko). The SWKIs' complaint asserted that Anadarko had failed to file their natural gas sales contracts executed in 1998 and 2002 with the Commission as required by K.S.A. 66-109 and K.S.A. 66-117 and that these contracts—and the rates contained in them for the sale of natural gas—were never approved by the Commission. Based on Anadarko's failure to comply with these statutes, the SWKIs contend that according to the filed rate doctrine, it was unlawful for Anadarko to charge them for any of the natural gas provided to them. The Commission dismissed the complaint, holding that because the SWKIs had not otherwise claimed that the rates they were charged for natural gas were unreasonable, they had failed to state a claim upon which relief could be granted. Alternatively, the Commission held that even if they had stated a valid claim, the SWKIs were not entitled to any relief because they had not been damaged by Anadarko's action. The district court denied the SWKIs' petition for judicial review. For reasons we will more fully explain below, because we agree with the SWKIs that they have stated a cognizable claim for relief and that the Commission erred in summarily denying them relief, we reverse and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

Since before the 1930s, regulated utilities such as natural gas providers and pipelines have been required to comply with a myriad of statutes and regulations to ensure that regulatory agencies have sufficient information to oversee the monopolistic utilities' operations and pricing. See *Federal Power Commission v. Natural Gas Pipeline Co. of America*, 315 U.S. 575, 582-83, 62 S. Ct. 736, 86 L. Ed. 1037 (1942) (upholding constitutionality of Natural Gas Act of 1938, 15 U.S.C. § 717 et seq.); *The State, ex rel., v. Flannelly*, 96 Kan. 372, 381-82, 152 P. 22 (1915) (receivers managing assets and sales of natural gas company constitute a public utility subject to supervision of state utilities

2

commission). This appeal raises the question of whether a regulated utility's customers may file and pursue a complaint with the Commission seeking a refund of payments made to the utility based upon rates which allegedly failed to comply with procedural requirements adopted by the Legislature and the Commission to ensure the regulator has sufficient information to exercise its oversight functions.

Here, SWKI-SE and SWKI-SWC entered into natural gas purchase agreements in 1998 and 2002 with entities related to Anadarko for natural gas carried on the Hugoton Residue Delivery System (HRDS). The SWKIs are nonprofit public utilities with certificates of convenience and necessity issued by the Commission to provide natural gas to their customers. Because this case comes to us from the Commission's dismissal for failure to state a claim, we assume the facts as alleged by the SWKIs are true. See *Cohen v. Battaglia*, 296 Kan. 542, 545-46, 293 P.3d 752 (2013). Taking the facts alleged by the SWKIs as true and as reflected in the record on appeal, we summarize the rather tortured relationship between the parties.

In 1994, Anadarko Gathering Company (AGC) obtained a limited certificate of convenience from the Commission, permitting it to provide natural gas service to specific customers in southwest Kansas and to take over another related company and its contracts. As part of its certificate, AGC was permitted to enter into individual customer contracts with its predecessor's customers. AGC was required to file its exact rates, rules, and regulations with the Commission under its own name; those rates, rules, and regulations were required to be identical to that of its predecessor.

After SWKI-SE was approved to operate by the Commission in 1998, it entered into a contract to purchase all the raw, untreated natural gas it needed from Anadarko Energy Services Company (AESC), a company related to Anadarko and AGC. The contract specified the process to calculate the price of gas sold and provided a delivery surcharge; the contract operated on a month-to-month basis subject to termination by

3

either party with 30 days' written notice. Each party had the right, upon reasonable notice, to examine the books and records of the other to verify the accuracy of any charges or payments made by the other; absent a specific objection, all payments made were considered final, and any right to an adjustment would lapse after two years unless a specific objection was made. The contract also contained an arbitration clause requiring any disputes arising from the contract to be settled by arbitration.

In 1999, AGC filed an application with the Commission to transfer its limited certificate to operate to Anadarko. Anadarko and AGC asked the Commission to approve the assignment of the existing contracts and rate schedules on file with the Commission with AGC's existing customers to Anadarko. Anadarko also requested permission to file additional contracts for Commission approval. In May 2000, the Commission approved the transfer of AGC's certificate to Anadarko and the customer-specific rate schedules from AGC. The Commission also permitted Anadarko to obtain new contracts with new customers but required the utility to "file all Customer Specific Certificates and Contract Rate Schedules for review and approval of the Commission consistent with applicable Kansas statutes and regulations." The proposed tariff under the order specifically provided that "[n]o service under any such Contract shall be effective until such Contract has been filed with and approved by the Kansas Corporation Commission." Several months thereafter, Anadarko sent correspondence to the Commission's staff identifying and including copies of individual contracts with its customers. According to a report from the Commission's staff, this correspondence included the contract between AESC and SWKI-SE.

After SWKI-SWC received its certificate of convenience from the Commission, it entered into a natural gas purchase agreement with Anadarko in June 2002. This contract was strikingly similar to the SWKI-SE contract; it included the provisions for calculating the cost of gas sold, the month-to-month contract provision, the right to examine books, and an arbitration clause.

4

In 2007, various Anadarko-related companies entered into an agreement with TKO Energy Services, LLC to transfer some of its customers' contracts to them; the SWKIs' contracts were not included in the customers transferred to TKO. Shortly thereafter, Anadarko filed a petition with the Commission seeking approval of its transfer of 55 natural gas contracts to TKO, and TKO filed an application for a certificate of convenience and necessity to serve those 55 natural gas customers. Attached to TKO's application was a list of customers that Anadarko was retaining; this list identified the SWKIs' contracts as among those retained by Anadarko.

At no time during the exercise of their respective contracts with the Anadarko companies did the SWKIs ever file a complaint about Anadarko's operations, the quality of the gas provided, or the rates charged by Anadarko. The SWKIs made payments as required under these contracts without dispute. This changed in 2013.

In 2013, Anadarko and Black Hills Energy (Black Hills) filed a joint application with the Commission seeking approval of Anadarko's sale of its assets and assignment of its customer contracts in exchange for a portion of its service territory. The SWKIs' contracts were among the contracts Anadarko sought to transfer to Black Hills, and Black Hills' existing tariff rates would have resulted in an increase in the SWKIs' cost to purchase natural gas. During the Commission's docket considering Anadarko's and Black Hills' application, the Commission's staff reported that they could not find any Commission order approving the gas sales contracts Anadarko sought to transfer. The SWKIs, having intervened in the docket, also received a copy of the staff report.

Immediately thereafter, the SWKIs filed a complaint with the Commission against Anadarko, asserting that Anadarko provided gas to them based upon contracts which Anadarko never filed with the Commission and which the Commission never approved. The SWKIs also claimed the price they paid Anadarko under the contracts was significantly higher than that charged to Anadarko's other customers and that the charges

5

were unlawful because their contracts had not been filed with or approved by the Commission. Given the Commission's power to establish a lawful rate and order refunds of overcharges, the SWKIs specifically requested the Commission to find that all rates charged by Anadarko were unlawful, void, and subject to refund, with interest.

Anadarko responded to the SWKIs' complaint by filing an answer and a motion to dismiss, asserting that over the 10-plus years of each contract, the contract price for gas had not changed and the SWKIs had never complained to Anadarko or the Commission about the price or any of the services Anadarko provided under the contracts. Anadarko disputed the SWKIs' claims that "cost-based rates" meant they were overcharged because the contracts did not use cost-based rates and explained at length that the original contracts were predicated on its Limited Certificate of Convenience which permitted individual contracts. Anadarko also pointed to evidence from the Anadarko/Black Hills docket which, at a minimum, inferred that the Commission's staff had been provided the contracts or the Commission had other documents in its files showing that the contracts had been filed. Anadarko argued that in the absence of any objection by the SWKIs or the Commission, the contracts should be deemed approved.

In its motion to dismiss, Anadarko asserted, among other defenses, that the SWKIs' complaint failed to state a claim upon which relief could be granted. Anadarko claimed the 1998 contract was executed at a time when the Commission lacked jurisdiction over the contract and that when Anadarko transformed from a gathering system to a transporter in approximately 2000, its contracts, including the contract with SWKI-SE, had been filed with the Commission. Because the Commission did not suspend the contracts, Anadarko argued, the contracts were deemed approved under K.S.A. 66-117. Anadarko also contended the SWKIs' complaint was inconsistent with the position they took in the Black Hills' docket, where they requested that any order approving the transfer of their contracts to Black Hills barred Black Hills from changing

6

the rates set forth in the original contracts until such time as Black Hills filed a new rate case.

After a pretrial conference, the parties agreed that several threshold issues existed. First, the Commission had to address whether it had jurisdiction to determine the merits of the SWKIs' complaint against Anadarko. Second, the Commission had to determine whether it had authority to order a refund or award damages to the SWKIs. Finally, the Commission was required to determine the legal effect of gas sales contracts which may have not been filed with the Commission.

The Commission issued its order in January 2015, and first determined that K.S.A. 2016 Supp. 66-154a applied to the complaint because Anadarko, as a natural gas pipeline, qualified as a common carrier. Under that statute, the Commission concluded that it could only investigate a complaint when the complainant asserted claims that "an unfair, unjust, unreasonable or unjustly discriminatory or unduly preferential rate or charge has been exacted." K.S.A. 2016 Supp. 66-154a. Similarly, the Commission found that the SWKIs' reliance on K.S.A. 66-1,205 faced the same result as that statute also refers to complaints which assert "that any rates or rules and regulations . . . are in any respect unreasonable, unfair, unjust, unjustly discriminatory or unduly preferential, or both." K.S.A. 66-1,205(a).

Although the SWKIs' original complaint asserted they were charged significantly higher rates than other Anadarko customers, the SWKIs advised the Commission that both they and Anadarko had performed their obligations under their respective contracts and that their complaints were based solely on Anadarko's failure to file the contracts with the Commission. Accordingly, the Commission found that the SWKIs' failure to allege that Anadarko's rates were "unfair, unjust, or discriminatory" meant the complaint failed to state a claim under either K.S.A. 2016 Supp. 66-154a or K.S.A. 66-1,205(a).

7

Despite finding that the SWKIs' complaint had failed to state a claim upon which relief could be granted, the Commission alternatively concluded that even if the SWKIs' complaint was sufficient, any claim for a refund would be limited to three years' charges under K.S.A. 66-154c or based solely on the difference between a reasonable rate and any unjust rate found to have been charged. The Commission's initial order did not address the SWKIs' reliance on the common-law "filed rate doctrine" in its pleadings and briefs.

The Commission's order then proceeded to discuss the administrative fines recommended by its staff for Anadarko's failure to file the SWKIs' contracts with the Commission. Contemporaneously to the present case, the Commission's staff issued a report on the investigation it started in the Black Hills docket, and that report was filed in this proceeding. The report recommended that substantial fines be assessed against Anadarko and that refunds be made to the SWKIs. Anadarko and the Commission's staff ultimately reached a settlement limited to resolving the civil penalty claims only. As a result, the settlement agreement was also filed in this proceeding. The Commission reviewed the proposed settlement agreement reached between its staff and Anadarko resolving this disputed issue and approved the settlement which reduced Anadarko's civil penalties and allowed Anadarko to avoid any admission that it or its related companies violated of any state or federal law or regulations.

The SWKIs timely sought reconsideration of the Commission's order dismissing their complaint and renewed their arguments disagreeing with the Commission's interpretation of K.S.A. 66-1,205 and its application of K.S.A. 2016 Supp. 66-154a to their complaint against Anadarko. Moreover, they once again argued that in accordance with the filed rate doctrine, the Commission's "approval" of Anadarko's rates now—when the contracts had not been filed previously—constituted prohibited retroactive ratemaking. The SWKIs also asserted that the Commission's order lacked adequate findings of fact to support its decision and failed to address its arguments about the filed

8

rate doctrine. Finally, the SWKIs argued that if their complaint was deficient, Commission regulations required that they be permitted to amend their complaint under K.A.R. 82-1-220.

The Commission issued an order denying reconsideration, finding that because the SWKIs never alleged unjust rates, the complaint failed to state a claim under its regulations. The Commission also noted that the SWKIs had failed to seek reconsideration of its order approving the settlement agreement between the Commission's staff and Anadarko.

On March 27, 2015, the SWKIs filed a timely petition for judicial review of the Commission's order in the Stevens County District Court alleging the Commission had misinterpreted and misapplied the law, that its order was not supported by substantial competent evidence, and that the decision was otherwise arbitrary and capricious. Anadarko was allowed to intervene in the action, and it promptly moved to change venue to the Shawnee County District Court pursuant to K.S.A. 77-609(b). Although the SWKIs opposed the venue motion, the Stevens County District Court transferred the case to Shawnee County.

After considering the parties' arguments and briefs, the district court denied the petition for judicial review. After setting forth the facts, the district court applied the summary judgment standard, noting that a motion to dismiss should be treated like a motion for summary judgment when more than just the pleadings are considered. After recognizing there was a factual dispute as to whether Anadarko's contracts had been properly filed with the Commission, the district court evaluated the Commission's interpretation of K.S.A. 66-109, 66-117 and 66-1,203.

The court made essentially three key legal conclusions. First, the court found that K.S.A. 66-109 did not create a private cause of action allowing entities to file a claim

9

with the Commission unless the complaining party asserted it had been subjected to unfair rates. Second, the court found that while K.S.A. 66-117 permitted private entities to join Commission proceedings, the statute did not allow a private cause of action permitting a customer to challenge a utility contract other than as an intervenor. The court also found that K.S.A. 66-1,203 does not provide a private cause of action absent a claim of "unjust, unreasonable, unjustly discriminatory or unduly preferential" actions by the natural gas utility. Third, the court concluded that the doctrine of retroactive ratemaking only applied when a public utility adjusts an established rate and that refunds were only available when there was a claim of unfairness in the rates or fees.

The SWKIs timely appeal.

The SWKIs challenge the Commission's final order pursuant to the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., which defines the scope of judicial review of a state agency action including decisions of the Commission. K.S.A. 2016 Supp. 77-603(a); *Ryser v. Kansas Bd. of Healing Arts*, 295 Kan. 452, 458, 284 P.3d 337 (2012). The SWKIs assert the Commission (1) failed to address an issue requiring resolution; (2) erroneously interpreted or applied the law; (3) acted based upon a determination of fact that is not supported by substantial evidence when viewed in light of the record as a whole; (4) failed to follow its own procedures; and (5) acted in a manner that is otherwise unreasonable, arbitrary, or capricious. See K.S.A. 2016 Supp. 77-621(c)(3)-(5), (7), and (8).

I.      DO KANSAS UTILITY STATUTES PERMIT CUSTOMERS TO FILE COMPLAINTS AGAINST A UTILITY THAT FAILS TO COMPLY WITH STATUTES EVEN IF THERE ARE NO ALLEGATIONS OF DISCRIMINATORY OR UNFAIR PRICING AND PRACTICES?

In a combination of various arguments, the SWKIs contend the Commission and the district court erred in finding that their complaint failed to state a claim as a matter of

10

law under K.S.A. 2016 Supp. 66-154a and K.S.A. 66-1,205. First, the SWKIs argue that the common carrier statute, K.S.A. 2016 Supp. 66-154a, does not apply to Anadarko because Anadarko is a natural gas utility and that no party ever claimed Anadarko was a common carrier or that it charged for transportation of natural gas. The SWKIs also contend the Commission and district court misinterpreted K.S.A. 66-1,205 because it was interpreted to effectively ignore the recognized filed rate doctrine.

We have the authority to grant relief from an agency action if we determine that the Commission erroneously interpreted or applied the law. K.S.A. 2016 Supp. 77-621(c)(4). Because the SWKIs argue, in part, that the Commission improperly interpreted several relevant statutes, it raises questions of statutory interpretation which we review de novo. See *Midwest Crane & Rigging, LLC v. Kansas Corporation Comm'n*, 306 Kan. 845, 848, 397 P.3d 1205 (2017). In addition, because the doctrine of operative construction no longer applies in Kansas, we need not give deference to the Commission's interpretation of the statutes in question. 306 Kan. at 848-49.

A.      *K.S.A. 2016 Supp. 66-154a*

The SWKIs first challenge the Commission's reliance on K.S.A. 2016 Supp. 66-154a, asserting that this statute is inapplicable to its contracts with Anadarko. That statute states:

> "No *common carrier* shall charge, demand or receive . . . *an unreasonable, unfair, unjust or unjustly discriminatory or unduly preferential rate or charge for the transportation of property*, . . . or for any service afforded by it in the transaction of its business as a common carrier; and *upon complaint in writing made to the corporation commission that an unfair, unjust, unreasonable or unjustly discriminatory or unduly preferential rate or charge has been exacted*, such commission shall investigate such complaint, and if sustained, shall make a certificate under its seal setting forth what is, and what would have been, a reasonable and just rate or charge for the service rendered,

which shall be prima facie evidence of the matter therein stated." (Emphasis added.) K.S.A. 2016 Supp. 66-154a.

The term "common carrier" includes "all freight-line companies, equipment companies, pipe-line companies, and all persons and associations of persons, whether incorporated or not, operating such agencies for public use in the conveyance of persons or property within this state." K.S.A. 2016 Supp. 66-105.

Although the Commission found that Anadarko was a common carrier because it transported gas along a pipeline, there is no evidence in the record that Anadarko was acting as a common carrier with respect to its contracts with the SWKIs. Under those contracts, Anadarko (and its related companies) were only obligated to sell natural gas to the SWKIs at specified sites for a specified rate. While Anadarko charged a monthly delivery charge in addition to the charge for natural gas, there is little in the record to support any claim that Anadarko's contracts with the SWKIs involved the transportation of any natural gas from one location to another on the SWKIs' behalf. Thus, it appears that the Commission erred in relying on K.S.A. 2016 Supp. 66-154a in evaluating Anadarko's obligations to the SWKIs.

B. *K.S.A. 66-1,205*

On the other hand, the SWKIs do not dispute that K.S.A. 66-1,205 applies to their complaint filed with the Commission. In fact, the SWKIs rely on this statute, in addition to others, in support of their complaint against Anadarko. The SWKIs do contest, however, the Commission's interpretation of this statute in a manner justifying the dismissal of their complaint.

K.S.A. 66-1,205(a) states in relevant part:

12

"Upon a complaint in writing made against any natural gas public utility . . . *that any rates or rules and regulations* of such natural gas public utility *are in any respect unreasonable, unfair, unjust, unjustly discriminatory or unduly preferential, or both*, or that any rule and regulation, *practice or act whatsoever affecting or relating to any service performed* or to be performed by such natural gas public utility for the public, is *in any respect unreasonable, unfair, unjust, unreasonably inefficient or insufficient, unjustly discriminatory or unduly preferential*, . . . the commission may proceed, with or without notice, to make such investigation as it deems necessary." (Emphasis added.)

Here, the Commission dismissed the SWKIs' written complaint on the basis that they failed to allege that Anadarko's rates were unreasonable, unjust, or discriminatory. The Commission based its determination on the SWKIs' failure to claim in the Black Hills' docket that Anadarko's performance under the natural gas purchase contracts was deficient or incompetent and Anadarko's failure to claim that the SWKIs' payments were inadequate. In their original complaint, the SWKIs stated that Anadarko's gas rates were not "cost-based" and higher than those charged to other customers; at the subsequent prehearing conference, however, the SWKIs did not specifically assert that Anadarko's rates were discriminatory or unfair in the sense that they were unreasonably high as compared to the market price for natural gas. Instead, the SWKIs' sole basis for claiming that Anadarko's rates were improper was because they were never filed with or approved by the Commission prior to the Black Hills proceeding. The SWKIs emphasize that the filing and approval of individual contracts was required both by Anadarko's tariff and by the conditions imposed by the Commission on Anadarko's certificate of convenience.

The SWKIs, rather than focusing on the language of the statute, simply invoke the common-law "filed rate doctrine" as the basis to dispute the Commission's interpretation. This argument is misplaced, at least to a degree, because the common law can be overridden by any inconsistent legislative enactment. See, e.g., *City of Haven v. Gregg*, 244 Kan. 117, 122-23, 766 P.2d 143 (1988). In Kansas, the filed rate doctrine is codified in K.S.A. 66-109, which forbids common carriers and public utilities to "charge, demand,

13

collect or receive a greater or less compensation . . . than is specified in the printed schedules or classifications" required by the Commission. As the SWKIs have noted, Kansas follows the filed rate doctrine to the extent a public utility charges a rate in excess of the filed rates and tariffs. See *Sunflower Pipeline Co. v. Kansas Corporation Commission*, 5 Kan. App. 2d 715, 722-23, 624 P.2d 466, *rev. denied* 229 Kan. 671 (1981) (pipeline that charged fees in excess of filed rates required to provide refunds, even if filed rates were unreasonably low).

The question remains, however, whether the complaint procedure provided in K.S.A. 66-1,205 applies when a party complains that a public utility failed to comply with K.S.A. 66-1,203, which requires natural gas utilities to publish and file with the Commission all schedules of rates and contracts for services.

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. See *Hoesli v. Triplett, Inc*., 303 Kan. 358, 362, 361 P.3d 504 (2015). Our duty is first to attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). When a statute is plain and unambiguous, we are not to speculate about the legislative intent behind that clear language and must refrain from reading something into the statute that is not readily found in its words. *Hoesli*, 303 Kan. at 362.

The Commission is given authority to investigate complaints filed by third parties when a public utility's rates or regulations are "in any respect unreasonable, unfair, unjust, unjustly discriminatory or unduly preferential, or both." K.S.A. 66-1,205(a). As such words are left undefined by the Legislature, we look to their common and ordinary meaning. "Unfair" has been defined as "[n]ot honest, impartial or candid; unjust." Black's Law Dictionary 1760 (10th ed. 2014). "Unjust" has been defined as "[c]ontrary to justice; not fair or reasonable." Black's Law Dictionary 1771 (10th ed. 2014). Likewise,

14

"unreasonable" is defined as "[n]ot guided by reason; irrational or capricious." Black's Law Dictionary 1772 (10th ed. 2014). Kansas caselaw, frequently in the regulatory field, has often equated "unreasonableness" in rates to unlawful rates. See *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 490, 720 P.2d 1063 (1986) (reasonable rates are those that are not "'*so unreasonably low or so unreasonably high as to be unlawful*'") (quoting *Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, Syl. ¶ 17, 386 P.2d 515 [1963]); *Western Resources, Inc. v. Kansas Corporation Comm'n*, 30 Kan. App. 2d 348, 357, 42 P.3d 162, *rev. denied* 274 Kan. 1119 (2002) (same).

Moreover, while it is true that an agency's regulations cannot exceed its statutory authority, see *Ryser*, 295 Kan. at 464-65, the Commission's own regulations appear to be contrary to the Commission's position before us as they presume a broad reading of its statutory authority under K.S.A. 66-1,205. The SWKIs' complaint was filed pursuant to K.A.R. 82-1-220, which states:

> "(a) Any person may initiate a complaint proceeding by filing a formal complaint with the commission in which the rates, joint rates, fares, tolls, charges, regulations, classifications, or schedules of any public utility, motor carrier, or common carrier are alleged to be unreasonable, unfair, unjust, unjustly discriminatory, or unduly preferential, *or that allege that any service performed or to be performed is **illegal**, unreasonably inadequate, inefficient, or unduly insufficient, or cannot be obtained*.

> "(b) Formal complaints shall be submitted in writing and shall comply with the requirements of these regulations. Formal complaints shall meet the following conditions:

> (1) Fully and completely advise each respondent and the commission *as to the provisions of law or the regulations or orders of the commission that have been or are being violated* by the acts or omissions complained of, or that will be violated by a continuance of acts or omissions;

(2) set forth concisely and in plain language the facts claimed by the complainant to constitute the violations; and

(3) state the relief sought by the complainant.

"(c) Commission action required upon the filing of a formal complaint. A formal complaint shall, as soon as practicable, be examined by the commission to ascertain whether or not the allegations, if true, *would establish a prime facie case for action by the commission* and whether or not the formal complaint conforms to these regulations." (Emphasis added.)

The regulation also defines a "complainant" as

"any party who complains to the commission of either of the following:

"(1) Anything done or failed to be done in contravention or violation of either of the following:

(A) The provisions of any statute or other delegated authority administered by the commission; or

(B) any orders or regulations issued or promulgated by the commission under statute or delegated authority.

"(2) any other alleged wrong over which the commission may have jurisdiction." K.A.R. 82-1-204(d).

A complaint which reports that a public utility's rates or regulations are unlawful is consistent with asserting that such rates are unreasonable, unfair, or unjust. This broad reading of K.S.A. 66-1,205 is also consistent with K.S.A. 66-1,207 which, like many similar statutes governing the Commission's authority, requires that statutory provisions granting the Commission power "shall be liberally construed, and all incidental powers

16

necessary to carry into effect the provision of this act are expressly granted to and conferred upon the commission." K.S.A. 66-1,207 (powers relating to natural gas utilities); see also K.S.A. 66-101g (liberal construction of statutes regulating electric public utilities); K.S.A. 66-1,194 (liberal construction of statutes regulating telecommunications carriers). Accordingly, we hold the Commission erred in concluding that the SWKIs, by alleging that Anadarko's contracts were illegal for having failed to file them with the Commission, had failed to state a claim upon which relief could be granted.

II.     ARE THE SWKIS ALLOWED TO RECOVER THE TOTAL OF ALL PAYMENTS THEY MADE TO THE ANADARKO-RELATED COMPANIES?

The bulk of the SWKIs' legal arguments focus on the filed rate doctrine, well recognized at common law and by many regulatory agencies. Because the SWKIs contend the filed rate doctrine controls the interpretation of the statutes in dispute, our standard of review remains de novo. See *Midwest Crane & Rigging, LLC*, 306 Kan. at 848.

A.     *The Filed Rate Doctrine*

At its very basic level, the filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S. Ct. 2925, 69 L. Ed. 2d 856 (1981). In other words, when a regulated business receives approval from a regulatory agency to charge specific rates and use specific rules for dealing with its customers, the business cannot unilaterally change those rates or rules without first obtaining consent from the relevant regulatory agency. If a business charges customers more than its approved rates without regulatory approval, it is in violation of

17

its contract with the customer and the utility is obligated to refund the overcharges. See *Arkansas Louisiana Gas Co.*, 453 U.S. at 577-78.

The filed rate doctrine serves a two-fold purpose. First, it protects the regulatory agency's primary jurisdiction to determine the reasonableness of rates charged by regulated industries. Second, the doctrine ensures that regulated companies charge only those rates which the agency has approved. *Arkansas Louisiana Gas Co.*, 453 U.S. at 577-78. Thus, courts lack authority to impose or enforce a different rate than that approved by the regulatory agency because the agency possesses primary jurisdiction to resolve such issues. The doctrine also prohibits agencies from *retroactively* substituting a new rate, even if the prior approved rate was unreasonably high or low. 453 U.S. at 578. As noted in another context,

> "'[t]he [Interstate Commerce] Act altered the common law by lodging in the Commission the power theretofore exercised by courts, of determining the reasonableness of a published rate. If the finding on this question was against the carrier, reparation was to be awarded the shipper, and only the enforcement of the award was relegated to the courts.' [Citation omitted.]" *Maislin Industries, U.S. v. Primary Steel*, 497 U.S. 116, 129, 110 S. Ct. 2759, 111 L. Ed. 2d 94 (1990).

See also *Amundson & Assocs. Art Studio v. National Council on Comp. Ins.*, 26 Kan. App. 2d 489, 497-98, 988 P.2d 1208, *rev. denied* 268 Kan. 885 (1999) (applying filed rate doctrine in insurance contract dispute).

Kansas has long followed the filed rate doctrine when utilities vary their charges or services from the rates and standards approved by the Commission. For example, the SWKIs rely heavily on *Sunflower Pipeline Co.*, 5 Kan. App. 2d 715. In that case, Sunflower had filed its rates with the Commission for the sale of natural gas. While those filed rates were in effect, Sunflower entered into private contracts with some of its customers to sell natural gas for 40 cents more per mcf than the rates approved by the

18

Commission. Sunflower did not apply for a rate increase with the Commission, nor did it send the contracts with the higher rates to the Commission. When a customer complained to the Commission, it issued an order directing Sunflower to show cause why it should not be ordered to refund all excess charges to its customers. After a hearing, the Commission ordered Sunflower to refund all charges in excess of those on file with the Commission (approximately $136,000) to all of its retail customers, plus interest. 5 Kan. App. 2d at 716.

On appeal, Sunflower argued the refunds were unreasonable because a sudden increase in the price of gas after its original rates were approved caused Sunflower to operate at a deficit. Sunflower also argued that paying refunds, even over the two-year period prescribed, would cause the company to operate at a deficit. Citing K.S.A. 66-108 [now K.S.A. 66-101c]—which requires public utilities to file their rates with the Commission—and K.S.A. 66-109—which forbids variations from the filed rates—our court upheld the Commission's order. 5 Kan. App. 2d at 718-19. The court rejected Sunflower's economic argument noting that in the face of net losses, the utility's only option was to apply for a rate increase with the Commission. Although the court recognized there was no express authority for the Commission to order refunds, it found the Commission's broad powers to regulate utilities included the incidental power to order the return of overcharges in excess of filed rates. 5 Kan. App. 2d at 719-20. The court further concluded that the full refund ordered by the Commission was appropriate under existing legal standards, even if the existing approved rate was unreasonably low. 5 Kan. App. 2d at 721.

Ultimately, the court found that less than full refunds would amount to improper retroactive ratemaking by the Commission and that the contracts for charges in excess of the filed charges were void. 5 Kan. App. 2d at 722. The court, however, remanded the case for the Commission to fully consider the impact on the utility of requiring the refunds to be completed within two years because the Commission did not expressly

19

consider the pipeline's continued ability to provide services under the financial strain imposed by the refund order. 5 Kan. App. 2d at 723.

However, the filed rate doctrine does not just protect consumers—it protects both the regulated business and its customers by not allowing "either a shipper's ignorance or the carrier's misquotation of the applicable rate to serve as a defense to the collection of the filed rate." *Maislin Industries*, 497 U.S. at 120-21. Kansas courts also have recognized that a customer cannot enforce a contract that grants it special rates or privileges that are not consistent with the regulated business' filed rates. *Mollohan v. Railway Co.*, 97 Kan. 51, 56, 154 P. 248 (1916) (dismissal of customer's claim for damages for railroad's breach of promise to make unscheduled stop to offload customer's cattle).

B.      *Application of the Doctrine to Unfiled Contracts or Tariffs*

In all the Kansas cases and the majority of cases cited by the SWKIs, the filed rate doctrine was applied when the Commission had approved a regulated entity's practices and rates, and then the entity violated the approved standards. The SWKIs assert, however, that the filed rate doctrine also applies when a regulated entity operates without a certificate of convenience or otherwise timely fails to file for approval of its rates.

The SWKIs primarily rely on *Michigan Elec. Transmission Co. v. Midland Cogenerations Venture, Ltd. Partnership*, 737 F. Supp. 2d 715 (E.D. Mich. 2010), and *Carolina Power & Light Company*, 87 FERC ¶ 61,083, 1999 WL 219889 (1999), in support of their argument that the filed rate doctrine requires the refund of all revenues under a contract when the utility has not filed any rate application or contracts with the appropriate regulator. Given the complicated context of those cases and the actual rulings on the issues, while they partially support the SWKIs' claim for relief, they fail to support the SWKIs' claim for a full refund.

20

### 1. *Michigan Electric Transmission Company*

In *Michigan Electric*, the Michigan Electric Transmission Company (METC) filed suit against Midland Cogeneration Venture LP, a power generating company, seeking recovery on substantial funds in connection with its operations of certain electrical transmission facilities. METC was a public utility subject to regulatory standards of the Federal Energy Regulatory Commission (FERC). Midland moved to dismiss the lawsuit, claiming it was barred by the filed rate doctrine.

The case arose after FERC began to approve "market based" tariffs for qualifying utilities; these tariffs permitted the seller of electricity to freely negotiate contracts with buyers. In these circumstances, the seller did not need to immediately file its contracts because it could rely on the prior market-based tariff on file. At the same time, FERC required electric utilities to "unbundle" their operations—meaning they had to offer generation and transmission services separately—and permit others to use their transmission operation on an open-access, nondiscriminatory basis.

Midland produced electric energy in a form used for industrial and commercial purposes. Midland entered into an agreement in 1986 with Consumers Power Company in which Consumers agreed to purchase electricity generated by Midland. In order to obtain Midland's electricity, however, Consumers was required to connect some of its own transmission facilities to Midland's. To establish this connection, Midland and Consumers entered into a facilities agreement, detailing each party's duties with respect to the construction, operation, and maintenance of the necessary transmission facilities and equipment needed for Consumers to consummate the purchase of Midland's power. In the facilities agreement, Midland agreed to reimburse Consumers for all of its direct and indirect costs, including property taxes, incurred by Consumers in owning and operating the new connection facilities. The facilities agreement also provided that the

21

contract could not be assigned without the consent of Midland. The facilities agreement was never filed with the FERC.

Several years after the agreement between Midland and Consumers was executed, Consumers filed an application with the FERC seeking approval to transfer its transmission assets to METC, a newly created subsidiary, essentially separating the company's generation and transmission operations. These parties advised FERC they anticipated that after approval of the asset transfer, METC would assume all transmission agreements Consumers had with its customers. They further represented to FERC that METC would provide the same open-access transmission services at the same rates specified in Consumers' filed transmission tariffs. While some customers intervened in the asset transfer proceeding, Midland did not. After a hearing, FERC approved the proposed transfer of Consumers' transmission facilities to METC. Its order specifically noted that the transfer included all of Midland's transmission assets "'and all related jurisdictional transmission tariffs, contracts, books and records.'" 737 F. Supp. 2d at 725.

Midland made payments under the facilities agreement to Consumers and then to METC. More than four years after FERC approved the asset transfer agreement, Midland stopped paying METC under the facilities agreement. METC then filed the lawsuit to collect on funds due under the facilities agreement. In response to METC's claims, Midland alleged that METC's state law contract claims violated the filed rate doctrine because Consumers never filed the facilities agreement with FERC. Midland also alleged that METC lacked standing to sue because the facilities agreement was not assignable and the attempted transfer of the facilities agreement from Consumers was invalid.

After expounding a great deal on the general nature of the filed rate doctrine, the court noted that the dispute focused on whether Consumers' and METC's filings in the asset transfer proceeding satisfied FERC's requirement that contracts such as the facilities agreement be filed with the agency. 737 F. Supp. 2d at 729-31. In response, METC cited

22

FERC's policy that if a contract is filed after service had commenced but the rates were found by FERC to be reasonable, it would require the utility to refund only "'the *time value of the revenues collected* . . . for the entire period that the rate was collected without Commission authorization.'" (Emphasis added.) 737 F. Supp. 2d at 731. Because of FERC's case-by-case approach and the possibility that FERC could find that Midland's contract was sufficiently filed in the asset transfer proceeding, the court rejected the claim that METC's petition failed to state a claim for relief. 737 F. Supp. 2d at 731. As a result of the lack of any FERC decision on whether the contract was adequately filed and whether the rates were reasonable, the court directed the parties to file briefs addressing the question of whether the issues should be deferred to FERC under the primary jurisdiction doctrine. 737 F. Supp. 2d at 732-33.

In its review, FERC found the facilities agreement and related agency agreement, although untimely filed, were valid and enforceable. See *Michigan Electric Transmission Company, LLC*, 138 FERC ¶ 61,202, 61,916, 2012 WL 955330 (2012). FERC found that Consumers was entitled to recover the rates in the facilities agreement for the entire period the contract existed and rejected Midland's reliance on the filed rate doctrine as a basis to prevent METC from collecting under the facilities agreement because the United States Supreme Court had recognized that FERC had the authority to waive the requirement to timely file rate contracts. FERC also stated that its practice of permitting late-filed agreements to be effective (with a time-value remedy for the late filing) was reasonable in light of the consensual bilateral contract involved. 138 FERC at ¶ 61,916-17.

2.      *Carolina Power & Light Company*

Carolina Power & Light Company (CPL) had two tariffs with FERC. One was a cost-based power sale tariff (PST), and one was an open access transmission tariff (OATT). In June 1998, CPL filed two customer service agreements under the PST and

23

two customer service agreements under the OATT. Under FERC regulations at the time, a regulated utility was required to file the agreement with FERC 60 days *before* commencing the contract services. See 16 U.S.C. § 824d(d) (1994); 18 C.F.R. §§ 35.3(a), 35.11 (1998). Because CPL had already commenced service under the various contracts, it requested FERC to waive the 60-day prior notice requirement, asserting that its failure to timely file the contracts was due to a failure in its administrative oversight during a period of rapid increase in the company's workload as a result of the OATT. In accordance with its practice, FERC reviewed the contracts and, having found them reasonable, approved them; however, it ordered CPL to reimburse the customers the "*time value of revenues collected*" under the contract for the time period before the contracts became effective. (Emphasis added.) 87 FERC at ¶ 61,355.

These cases support the proposition that in the absence of a filed rate, should the appropriate regulatory agency deem the rate reasonable, the time value of the money collected from the unfiled rate is a permissible remedy available under a regulatory agency's broad powers to set and approve rates.

While Kansas law requires all public utility rates to be filed and approved by the Commission and regulated utilities and common carriers are to be prohibited from charging a rate other than the rate on file with the Commission, none of these statutes expressly provide for consequences if they are violated. See K.S.A. 66-117; K.S.A. 66-109; K.S.A. 66-1,203. It was the *Sunflower* panel that recognized this lack of explicit authority but held that under K.S.A. 66-101—which granted the Commission "'full power, authority and jurisdiction to supervise and control the public utilities . . . doing business in the state'"—the Commission had the statutory authority "as a means of . . . enforcing its power to regulate rates" to determine appropriate remedies for violations of approved tariffs, including ordering refunds to customers charged rates higher than those authorized by the utility's filed tariff. 5 Kan. App. 2d at 719-20. Similarly, we hold here that in instances where a reasonable rate goes unfiled, the Commission has the statutory

authority to order a remedy, a remedy which may include the time value of money paid by the customer pursuant to an unfiled rate.

C.     *Retroactive Ratemaking*

Finally, the SWKIs claim that permitting Anadarko to keep any portion of the illegal revenue it received based on the unfiled contracts would constitute retroactive ratemaking because it would retroactively authorize Anadarko to charge for an unapproved contract. Kansas has long recognized the well-established principle that retroactive ratemaking is prohibited. See, e.g., *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission*, 217 Kan. 604, 615, 538 P.2d 702 (1975); *Kansas Gas & Electric Co. v. Kansas Corp. Comm'n*, 14 Kan. App. 2d 527, 532-33, 794 P.2d 1165, *rev. denied* 247 Kan. 704 (1990). Kansas courts have also recognized that the ban against retroactive ratemaking is more than a matter of policy; the ban is necessary to protect the vested rights of private litigants. *Kansas Gas & Elec. Co.*, 14 Kan. App. 2d at 533.

> "Retroactive ratemaking ordinarily occurs when a 'utility is required to refund revenues collected, pursuant to the then lawfully established rates, for such past use.' *Kansas Pipeline Partnership v. State Corp. Com'n*, 24 Kan. App. 2d 42, 57, 941 P.2d 390 (1997) (citation omitted). The same principles are involved, however, when a utility raises its rates without prior approval of the state regulatory agency. In Kansas, the ban on retroactive ratemaking has both a statutory and constitutional basis. K.S.A. 66-109 prohibits departures from KCC-established rates even if such rates are unreasonably low. See *Sunflower Pipeline Co.*, 5 Kan. App. 2d at 718-19. A rate fluctuation also implicates due process concerns by infringing on certain vested rights. As the Kansas Supreme Court noted:
>
> > "'[W]hen a rate has been the subject of a deliberate inquiry in which the carriers, the shippers and the commission's own experts have participated, . . . any rate so prescribed by the commission and put into effect by the carriers may be confidently collected and retained by them

25

. . . , without misgiving that at some future time a further hearing of the commission may be had and more evidence taken and a different conclusion reached, and those rates condemned as unreasonable . . . . Such a method of regulating public utilities has none of the earmarks of due process of law nor the simplest notions of justice. *Kansas Gas & Elec. Co.*, 14 Kan. App. 2d at 533 (quoting *State ex rel. Boynton v. Public Serv. Comm'n*, 135 Kan. 491, 504, 11 P.2d 999 [1932]).'" *United Cities Gas Co. v. Brock Exploration Co.*, 995 F. Supp. 1284, 1293 (D. Kan. 1998).

Under the unique circumstances presented in this case and the clear inequities which would result from granting the SWKIs' request for a full refund for all amounts paid under what are presumed to be contracts unfiled for nearly 20 years, given the fact that the SWKIs do not allege that the rates they paid were otherwise unreasonable apart from their illegality, given that Anadarko was already forced to pay fines in connection with its alleged failure to file the contracts, and given the Commission's broad statutory authority to order a remedy, we cannot say that any vested rights are implicated by a Commission remedy authorizing payments to the SWKIs in an amount less that the full amounts paid under the contracts as allegedly required by the filed rate doctrine. See generally *Genstar Chemical Ltd. v. I.C.C.*, 665 F.2d 1304, 1309 n.3 (D.C. Cir. 1981) (Commission has broad authority "to fashion appropriate remedy."). The SWKIs have no basis to complain that they are harmed by paying for the gas they accepted from Anadarko and its related companies over the years simply because of poor record-keeping by the Commission or ineffective management at Anadarko resulting in the missing filings. This notwithstanding, given that the Commission has the authority and the discretion to order an appropriate remedy under the circumstances, it must exercise that discretion by evaluating what remedy would be appropriate. Instead, the Commission abused its discretion by summarily rejecting the SWKIs' requested remedy out of hand. See *Harrison v. Tauheed*, 292 Kan. 663, 672, 256 P.3d 851 (2011) (abuse of discretion

occurs if discretion is guided by erroneous legal conclusion or goes outside framework of or fails to consider proper statutory limitations or legal standards).

Accordingly, we reverse the Commission's order finding that the SWKIs had failed to state a valid claim for relief and remand for additional proceedings to determine if the contracts were ever filed and approved by the Commission. If not, the Commission is directed to determine, in its discretion, if the SWKIs are entitled to a remedy for Anadarko's violations.

Reversed and remanded with directions.